UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| SHEILA K. KNIGHT,<br><br>  Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,[1] Acting<br>Commissioner, Social Security<br>Administration,<br><br>  Defendant. | CIV. 16-5041-JLV<br><br><br>ORDER |

## INTRODUCTION

Plaintiff Sheila Knight filed a complaint appealing the final decision of

Nancy A. Berryhill, the Acting Commissioner of the Social Security

Administration, finding her not disabled. (Docket 1). Defendant denies

plaintiff is entitled to benefits. (Docket 8). The court issued a briefing schedule

requiring the parties to file a joint statement of material facts ("JSMF"). (Docket

10). The parties filed their JSMF. (Docket 16). The parties also filed a joint

statement of disputed facts ("JSDF").[2] (Docket 16-1). For the reasons stated

---

[1]Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 20, 2017. Pursuant to Fed. R. Civ. P. 25(d), Ms. Berryhill is
automatically substituted for Carolyn W. Colvin as the defendant in all pending
social security cases. No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C.
§ 405(g).

[2]Unless otherwise indicated, the court finds the JSDF are factually
accurate as contained in the administrative record and will be referenced where
appropriate.

below, plaintiff's motion to reverse the decision of the Commissioner (Docket 17) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 16) and JSDF (Docket 16-1) are incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order.

On September 9, 2011, Ms. Knight filed an application for disability insurance benefits ("DIB") alleging an onset of disability as of that date. (Docket 16 ¶ 1). Her date of last insured for DIB coverage purposes was December 31, 2015. Id. ¶ 3. The onset date of disability was subsequently amended to April 30, 2009. Id. ¶ 2. On July 12, 2013, an ALJ issued an unfavorable decision. Id. ¶ 8. Ms. Knight, with current counsel, appealed to the Appeals Council. Id. ¶ 9. On October 24, 2014, the Appeals Council vacated the decision of the ALJ and remanded for a new hearing. Id. ¶¶ 10-13.

A remand hearing was held on March 3, 2015, before the same ALJ. Id. ¶ 14. On May 19, 2015, the ALJ issued a decision finding Ms. Knight was not disabled. Id. ¶ 19. On April 4, 2016, the Appeals Council denied Ms. Knight's request for review and affirmed the ALJ's decision. Id. ¶ 21. The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration. It is from this decision which Ms. Knight timely appeals.

The issue before the court is whether the ALJ's decision of May 19, 2015, that Ms. Knight was not "under a disability, as defined in the Social Security Act,

2

from September 9, 2011, [through May 19, 2015]" is supported by substantial evidence in the record as a whole. (AR at p. 47) (bold omitted); <u>see</u> <u>also</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Choate v. Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006); <u>Howard</u>, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DIB under Title XVI. 20 CFR § 416.920(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 25-26).

## DISCUSSION

Plaintiff challenges the ALJ's decision on a number of grounds. The issues posed by her are summarized as follows:

1. Did the ALJ properly reject the testimony of Ms. Knight, her caregiver and other lay witnesses;

2. Did the ALJ properly consider four neuropsychological tests;

3. Did the ALJ give proper weight of a non-examining psychologist over the opinions of a treating neurologist;

4. Did the ALJ properly consider whether the criteria of Listing 12.02 was met;[3] and

5. Was the ALJ's decision at step five supported by substantial evidence.

(Docket 18 at p. 5). Plaintiff's challenges to the ALJ's decision will be addressed as necessary.

### STEP ONE

At step one the ALJ determined Ms. Knight met the insured status requirements for DIB through December 31, 2015. (AR at p. 27). The ALJ found Ms. Knight's work activity "as a secretary for the South Dakota Department of Social Services from approximately June to August 2011" was "an

---

[3]20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00.

unsuccessful work attempt" because the "secretarial work is clearly in excess of the claimant's residual functional capacity [RFC] . . . ." Id. at p. 28. Consistent with that finding, the ALJ found Ms. Knight had not been engaged in substantial gainful activity after April 2009. Id. Ms. Knight does not challenge these findings. (Dockets 18 & 22).

**STEP TWO**

At step two the ALJ found Ms. Knight had the following severe impairments: "migraine headaches, asthma, seizure disorder,[4] cognitive disorder—NOS,[5] dementia-unspecified,[6] adjustment disorder with anxiety and

---

[4]The ALJ indicated Ms. Knight suffered from two separate types of seizure disorders, "a grand mal seizure" and "a monoclinic seizure." (AR at pp. 29 & 34) Dr. Wessel identified Ms. Knight's seizure as a "myoclonic" seizure. (AR at p. 755). The court presumes the ALJ intended to reference a "myoclonic seizure." "Grand mal seizure" is a synonym for a "generalized tonic-clonic seizure." Stedmans Medical Dictionary 807400. A "generalized tonic-clonic seizure [is] a generalized seizure characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground. The tonic phase of the seizure gradually give way to clonic convulsive movements occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of unconsciousness and gradual recovery." Id. A "myoclonic seizure [is] a seizure characterized by sudden, brief (200-msec) contractions of muscle fibers, muscles, or groups of muscles of variable topography (axial, proximal, or distal limb)." Id. at 807480. Dr. Weisensee described Ms. Knight's seizures as "generalized tonic-clonic and . . . possibly partial compex [seizures]." (AR at p. 1214). A "complex partial seizure" is "a seizure with impairment of consciousness, occurring in a patient with focal epilepsy." Stedmans Medical Dictionary 807300.

[5]"Cognitive impairment is when a person has trouble remembering, learning new things, concentrating, or making decisions that affect their everyday life. Cognitive impairment ranges from mild to severe. With mild impairment, people may begin to notice changes in cognitive functions, but still

depressed mood,[7] depressive disorder—NOS,[8] and anxiety disorder—NOS.[9]"

(Docket 16 ¶ 164).    Ms. Knight does not challenge these findings.    (Dockets

18 & 22).

---

be able to do their everyday activities.    Severe levels of impairment can lead to
losing the ability to understand the meaning or importance of something and the
ability to talk or write, resulting in the inability to live independently."    https://
www.cdc.gov/aging/pdf/cognitive_impairment/cogimp_poilicy_final.pdf.

[6]Dementia is "[t]he loss, usually progressive, of cognitive and intellectual
functions, without impairment of perception or consciousness; caused by a
variety of disorders, (structural or degenerative) but most commonly associated
with structural brain disease.    Characterized by disorientation, impaired
memory, judgment, and intellect, and a shallow labile affect."    Stedmans
Medical Dictionary 234950.

[7]"[An] adjustment disorder[] [is] a disorder the essential feature of which is
a maladaptive reaction to an identifiable psychological stress, or stressors, that
occurs within weeks of the onset of the stressors and persists for as long as 6
months; the maladaptive nature of the reaction is indicated by impairment in
occupational (including school) functioning, or in usual social activities or
relationships with others, or with symptoms that are in excess of a normal or
expectable reaction to the stressor."    Stedmans Medical Dictionary 259610.

[8]"Depression—NOS references depressive disorders that are impairing but
do not fit any of the officially specified diagnoses. . . . The diagnosis requires an
expenditure of time that is deemed unreasonable for most primary care
physicians.    For this reason, physicians often use this code as a proxy for a
more thorough diagnosis.    If a patient exhibits the depressive symptoms as the
major feature of their disorder, but does not meet the criteria for any other mood
disorder or any other mental disorder, then the depressive disorder, NOS is used.
NOS is a mental disorder described by an all-encompassing low mood
accompanied by low self-esteem, and loss of interest or pleasure in normally
enjoyable activities. . . . Persons with NOS have some symptoms of poor
concentration and memory, withdrawal from social situations and activities,
reduced sex drive, and thoughts of death or suicide, insomnia, loss of sleep, loss
of appetite, fatigue, headaches and digestive problems."    Cumella v. Colvin,
936 F. Supp. 2d 1120, 1127 (D.S.D. 2013) (internal citations, quotation marks
and brackets omitted).

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526. If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled. At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled." Bowen v. Yuckert, 482 U.S. 137, 141 (1987). A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). If not covered by these criteria, the analysis is not over, and the ALJ proceeds to the next step.

At this step the ALJ determined plaintiff's severe impairments did not meet or equal a listing under Appendix 1. (Docket 16 ¶ 165). Plaintiff challenges this decision. (Docket 18 at p. 5).

---

[9]Anxiety disorder is a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress. It included agoraphobia and panic disorders. MedicineNet.com.

Critical to the determination at step three was the ALJ's decision to reject the opinions of Dr. Laurie Weisensee, Ms. Knight's treating neurologist since December 2008.

> The undersigned declines to give controlling weight to, and rejects, the treating source opinion of Dr. Weisensee. It is not unaccompanied [sic] by any clinical or diagnostic findings. It appears to be based at least in part on statements of Lori Benson and Gail Penning who indicated that the claimant showed confusion and unawareness while she was employed at the Community Health Services in 2008. For reasons noted above, the non-medical source, third party, statements of Ms. Benson and Ms. Penning are not persuasive. To the extent Dr. Weisensee relied on their statements, her opinion is less persuasive. The doctor's opinion is inconsistent with the weight of the evidence, including her own clinical observations and prior assessment that the claimant had the cognitive and physical capacities to drive . . . . Great weight is given to the opinion of Dr. Pelc, whose expertise in psychology is better related to the claimant's assertions that she is disabled due to mental impairments, than is the expertise of Dr. Weisensee, who is a neurologist.
>
> Dr. Weisensee indicated that she was asked, in part, to give the status for the claimant's Social Security Disability claim . . . . Thus, it appears her opinion from April 20, 2015, was based on the claimant's need to obtain a statement is support of her claim that she is disabled.

(AR at p. 45).

Ms. Knight objects to this finding because "Dr. Weisensee's clinical considerations, orders, and findings are in the record. She was not required to reiterate the evidence in her assessment of functional limitations." (Docket 18 at p. 29). Ms. Knight is critical of the ALJ for giving greater weight to the opinions of Dr. Pelc, a non-examining, consulting expert for relying on the

medical records and not giving proper consideration to the lay-witness statements in the administrative record.   Id. at pp. 30-31.

Plaintiff contends "[t]he regulation for the assessment of mental disorders, 20 CFR § 404.1520a, requires consideration of claimant and lay witness reports."   Id. at p. 31 (referencing Appendix 1, Listing 12.00).   She asserts "[f]or a non-examining medical expert to consider Sections 12.00C through 12.00H, in compliance with 20 CFR § 404.1520a, the expert must consider disability and function reports (the "E" exhibits) and testimony of the claimant and witnesses, and the attenuation of symptoms associated with a structured, supportive environment."   Id. at p. 32 (emphasis in original).   Ms. Knight argues because "Dr. Pelc's assessment of functional capacity [fails] to consider foundational evidence required by 20 CFR § 1520a, [his opinions are] incompetent as a matter of law."   Id. at p. 33 (referencing Colhoff v. Colvin, No. CIV. 13-5002, 2014 WL 1123518, at *7 (D.S.D. Mar. 20, 2014)).

Ms. Knight also challenges the opinion of the ALJ for rejecting Dr. Weisensee's opinions because the doctor "had been asked to provide a medical source statement for Knight's disability claim."   (Docket 18 at p. 33).   Ms. Knight argues she "should not be penalized for adducing evidence to support her claim.   Further, the ALJ's rationale impermissibly imposed a catch-22: if the treating neurologist had not been asked to provide [a] MSS [medical source statement], the ALJ could have found this a reason to disbelieve the claimant." Id.

The Commissioner argues "[t]he ALJ considered the . . . appropriate factors in rejecting Dr. Weisensee's opinion, and this Court should affirm the Commissioner's final decision." (Docket 20 at p. 18). The Commissioner contends "[f]irst, the ALJ noted Dr. Weisensee did not provide any supporting clinical or diagnostic findings to support her opinion [and plaintiff's] argument amounts to speculation because Dr. Weisensee did not tie her opinion to any particular clinical or diagnostic finding in her medical report. Thus, the ALJ may properly reject an unsupported opinion." Id. at pp. 18-19 (referencing 20 CFR § 404.1527(c)(3)).

"Second," the Commissioner argues:

> [T]he ALJ found Dr. Weisensee relied on lay witness statements that the ALJ found unpersuasive . . . . Dr. Weisensee indicated she reviewed statements from Ms. Benson and Ms. Penning and found the statements were consistent with known symptoms of dementia . . . . Notwithstanding that the lack of awareness and confusion identified in Ms. Benson's and Penning's statements could be consistent with dementia, the statements alone do not establish Knight was actually experiencing such symptoms. Indeed, as the ALJ noted, the statements were inconsistent with statements Knight made to the agency and her doctors, which made them unpersuasive . . . .

Id. at p. 19.

The third argument advanced by the Commissioner is that "the ALJ found Dr. Weisensee's opinion was inconsistent with Knight's daily activities." Id. at p. 20. The Commissioner reminds the court that "[i]n weighing a doctor's opinion, the ALJ may consider inconsistencies between the opinion and the

claimant's activities of daily living."  Id. (referencing <u>Owen v. Astrue</u>, 551 F.3d 792, 799 (8th Cir. 2008)).

In rebuttal, Ms. Knight contends the Commissioner fails to acknowledge that dementia is a progressive illness and Ms. Knight's descriptions of her activities and abilities must be discounted.  (Docket 22 at pp. 5-8).  For this reason, Ms. Knight argues statements from lay witnesses must be "valued."  <u>Id.</u> at p. 5 (referencing Appendix 1, Section 12.00C.3).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." <u>House v. Astrue</u>, 500 F.3d 741, 744 (8th Cir. 2007) (citation and internal quotation marks omitted).  However, "while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent."  <u>Id.</u> (citations and internal quotation marks omitted).  If the treating physician's opinion is not given controlling weight under 20 CFR § 404.1527(d)(2), it must be weighed considering the factors in 20 CFR §§ 404.1527(d)(2)-(6).  <u>See</u> <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir. 2003) ("Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated . . . .").  The ALJ is free to accept those opinions of a treating physician which are supported by the medical evidence and plaintiff's own testimony.  <u>See</u> <u>House</u>, 500 F.3d at 744-46. "[W]hen a treating physician's opinions are inconsistent [with] . . . the medical evidence

as a whole, they are entitled to less weight." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002) (citations omitted). The ALJ must " 'give good reasons' for discounting a treating physician's opinion." <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878-79 (8th Cir. 2002).

The ALJ "decline[d] to give controlling weight to, and reject[ed], the treating source opinion of Dr. Weisensee." (AR at p. 45). One of the reasons expressed for arriving at this conclusion is because Ms. Knight asked for the doctor's statement to assist in her disability claim. <u>See id.</u> ("Dr. Weisensee indicated that she was asked, in part, to give the status for the claimant's Social Security Disability claim . . . . Thus, it appears her opinion from April 20, 2015, was based on the claimant's need to obtain a statement [in] support of her claim that she is disabled."). Rejecting the physician's report for this reason is contrary to the law. If the ALJ was unwilling to consider Dr. Weisensee's opinions in this format, it was the ALJ's obligation to have the doctor complete a medical source statement. <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004).

Second, the ALJ rejected Dr. Weisensee's opinions because the doctor "at least in part" based her opinions on the statements of Gail Penning and Lori Benson. (AR at p. 45). The ALJ found these lay witness opinions not credible because their descriptions of Ms. Knight's work and activities of daily living were contrary to Ms. Knight's own explanations. (AR at pp. 27-28 & 43).

The ALJ seems to have lost track of the progressive nature of dementia. Because the ALJ found Ms. Knight had severe dementia, the regulations require

that the statements and observations of family members and other lay witnesses who come into daily contact with the claimant be considered and given weight. See 20 CFR §§ 404.1512(b)(1)(iii) ("Evidence includes . . . [s]tatements . . . others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other statements you make to medical sources during the course of examination or treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings . . . .") and 404.1513(d)(4) ("In addition to evidence from the acceptable medical sources . . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.   Other sources include, but are not limited to . . . . Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy). . . .").   Accepting Ms. Knight's explanations, viewed through her rose-colored glasses, the ALJ minimized the tragedy of a diagnosis of dementia, which anticipates a diminishing grasp of reality.

Co-worker Lori Benson observed that Ms. Knight "denied that there was anything the matter with her performance and productivity."   (Docket 16 ¶ 142). Yet, Ms. Benson stated:

> But the fact was, we all helped Sheila.   I remember Sheila often appeared to be daydreaming or spacing out at work. And she would talk about one subject and go off on another and it was hard to follow.   She seemed forgetful. She had difficulty staying focused. She would start one task and get off track and start another task.   I remember noticing that and asking myself why she got distracted, what was she spacing out on.   Other times she seemed distant and

14

not engaged in a work-related conversation. Occasionally she seemed confused. Sometimes she was irritable. Sometime she complained of not feeling well, of pain throughout her body or in certain areas of her body. She had almost constant headaches it seemed. And she was absent from work a lot so, with all these issues, it was not a surprise that she was the one to be let go from our department. And yet she had good days when she performed well and got work done and was engaged.

Id.

Ms. Penning, Ms. Knight's spouse, provided detailed information over a lengthy period of time. (Docket 16 ¶¶ 136-38). She described the progressive development of Ms. Knight's dementia:

She used lots of reminders to remember what to do. She had difficulty finding the words to express what she needed. She had trouble remembering the day, and time of day. . . . The decline was slow but noticeable. I noticed more headaches, more falling down, more not remembering, a lot more stickies on the calendars, more writing on the whiteboard, more alarms on the phone. . . . Six years ago she could spell. Over time she lost that. When texting or writing notes, she would ask me how to spell a word, and I would look at what she was writing and rewrite it for her. I would show her what the sentence was supposed to look like and she would disagree. She would want to write it in her own unintelligible way . . . . [S]ometimes she can't figure how to set the temperature on the oven. She'll say I can't today. But other days she can do that. . . . She doesn't want anyone to see her fall, or find out she doesn't remember their names, and she'll stutter trying to get words out in a conversation, and that's why she doesn't want to go places.

Id. ¶ 137-38.

Ms. Penning's observations and concerns are verifiable because on March 29, 2013, Ms. Knight was certified for home health care. Id. ¶ 93. Among other things, home health care filled Ms. Knight's "medication box, requested refills from the pharmacy and assessed the patient for medical and nutritional

concerns and any knowledge deficits." Id. ¶ 94. A registered nurse in Ms. Knight's home care program reported she "fatigued easily, depended on landmarks when walking the dog, used sticky notes to keep tasks consistent, and exhibited slowed speech, decreased energy, fatigue, irritability, difficulty concentrating or thinking, and would worry about a doctor appointment, 'how to get there and that she will forget' and relied on her roommate to help her." Id. ¶ 143.

The decision of the ALJ to accept statements of Ms. Knight over the observations of her spouse and the other lay witnesses is contrary to the expectations of the regulations and the ALJ did not provide good reasons for discounting the testimony.

The next reason articulated by the ALJ for rejecting Dr. Weisensee's opinions was that they were "not unaccompanied [sic] by any clinical or diagnostic findings." (AR at p. 45). This statement ignores the fact that Dr. Weisensee was on the staff of the VA Medical System and had access to all of Ms. Knight's medical records. Supporting Dr. Weisensee's treatment of Ms. Knight in the VA system were Dr. James Gardiner, a neuropsychologist; Dr. Michael Dennis, a neuropsychologist; Dr. Michael Huxford, a psychologist, assisted by Kara Cline, a psychology intern; Aimee Jost, a Masters Degree level speech pathologist; Kyle Doeges, a Masters Degree level occupational therapist; Dr. Christopher Haas, a psychiatrist; and Jan Hines, a physician's assistant. (Dockets 16 ¶¶ 59, 77, 86, 88-89 & 124 and 16-1 ¶ 9).

In February 1998, Dr. Gardiner assessed Ms. Knight's cognitive functioning. (Docket 16-1 ¶¶ 9-12). He administered the following tests:[10] the Halstead-Reitan battery, the Controlled Oral Word Association Test, the Porteus Mazes[11] test, the Rey Auditory Verbal Learning Test, the Wisconsin Card Sorting Test, and the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"). Id. ¶ 11. On the WAIS-R, Ms. Knight's scores were "Verbal IQ was 83; Performance IQ, 88; and full-scale IQ, 83." Id. ¶ 12. Dr. Gardiner reported Ms. Knight's cognitive abilities as follows:

> High-average planning, foresight, and social awareness . . . ; Average vocabulary, visuospatial construction and reasoning. . . ; Low-average verbal fluency, long-term information store, attention, concentration, judgment knowledge, abstract reasoning, verbal intelligence, visual learning, performance intelligence, cognitive flexibility, thinking accuracy, tracking, sequencing, set shifting, and full-scale intelligence . . . ; and "Impaired" bilateral motor speed and strength, auditory memory, verbal learning, sentence repetition, visual memory, visual detail perception, and complex nonverbal problem solving. . . . "Impaired" functions were characterized by first- and second-percentile scores.

Id. ¶ 13. Dr. Gardiner's diagnosis included "dementia from unknown cause and recommended neurological examination to rule out neurological disease." Id. ¶ 16. Ms. Knight attended three cognitive rehabilitation sessions that fall. Id. ¶ 18. On February 1, 1999, Dr. Gardiner retested Ms. Knight. Id. ¶ 19. In

_____

[10]The neurological tests administered by all clinicians are described in Exhibit A attached to this order.

[11]The parties mistakenly identified this test as the "Corteus Mazes" test. (Docket 16-1 ¶ 11).

this test "[s]everal scores improved, but performance continued to be 'impaired' in verbal learning, verbal recognition, memory, and delayed recall of complex verbal and visual material."   Id.

In September 2011, Ms. Knight told PA Hines that her disconnect episodes were occurring more frequently, she felt a sense of disorientation with a loss of time, short term memory loss and fatigue.   (Docket 16 ¶ 124).

On December 1, 2011, Dr. Dennis completed a neuropsychological screening test, the Neuropsychological Assessment Battery ("NAB").   Id. ¶¶ 59 & 63.   Those test results included the following:

Attention Module—below 1st percentile, with subtests ranging below the 1st percentile to 69th percentile;

Memory Module—below 1st percentile, with subtests ranging below 1st percentile to 4th percentile;

Executive Functions—14th percentile;

Language Module—39th percentile, with subtest in Writing Syntax at below the 1st percentile;

Spatial abilities—13th percentile, with subtests ranging from the 1st percentile in Figure Drawing Recall to the 62nd in Figure Drawing Organization; and

Overall NAB Index—2nd percentile.

Id. ¶ 64.   Dr. Dennis' diagnoses included dementia—NOS; depressive disorder—NOS, anxiety disorder—NOS and rule out PTSD [post-traumatic stress disorder]. Id. ¶ 65.

In June 2012, Ms. Jost assessed Ms. Knight's speech-pathology as "symbolic dysfunction."[12]  Id. ¶ 87.   Ms. Jost provided Ms. Knight with speech pathology services to assist her independence in the community.   Id. ¶ 86. Those services included a GPS and another electronic device.   Id. ¶ 87.   Ms. Jost trained both Ms. Knight and Ms. Penning on how to use the devices.   Id.

In July 2012, Ms. Doerges provided occupational therapy, including a session with both Ms. Knight and Ms. Penning on using an iPod Touch as a cognitive aid.   Id. ¶ 88.

On March 29, 2013, PA Hines certified Ms. Knight for VA based home health care services for medication compliance and other services.   Id. ¶ 93; see also AR at pp. 494-95.   Home health care recertifications occurred six times between November 24, 2013, and January 13, 2015.   (AR at pp. 496-97, 987-1001, & 1160-68).   In the January 2015, PA Hines stated recertification of home health services was necessary because of Ms. Knight's functional limitations, involving endurance and ambulation, and mental status functions involving orientation and forgetfulness.   (AR at pp. 1160-61)

In May 2013, Dr. Haas saw Ms. Knight for evaluation and treatment of depression and insomnia.   Id. ¶ 89.   She said Sertraline improved her mood, diminished her anxiety, her depressive symptoms went away, and she was not

---

[12]"Symbolic dysfunction: Language/cognitive impairments of an organic nature."   (Docket 16 ¶ 171) (internal citation omitted).

experiencing any word-finding difficulties in social situations.   Id. ¶ 90.   Dr.

Haas reported:

> [Ms.] Knight was friendly and cooperative, had good eye contact, steady gait, casual dress, appropriate grooming and hygiene, no psychomotor agitation or retardation, no tics or other motor movements, normal speech, "good" mood, full affect, and normal thought process and content. . . . She was alert and oriented times three but got the date wrong by one.   She spelled "world" forward and backward, remembered 3/3 items immediately, and 2/3 items at 5 minutes. She knew the current and four previous presidents but missed Clinton. . . . She had fair insight and judgment.

Id. ¶ 91.   Dr. Haas' diagnosis included major depression, recurrent, mild, and

anxiety disorder.   Id.

On June 20, 2013, Dr. Huxford's team had Ms. Knight complete the

following tests: "[Delis-Kaplan Executive Function System] D-KEFS Color Word

Interference, Clock Drawing Test, California Verbal Learning Test—2nd Edition,

Rey Complex Figure Test, D-KEFS Verbal Fluency, D-KEFS Twenty Questions,

Hooper Visual Organization Test, the [Wechsler Adult Intelligence Scale—Fourth

Ed.] WAIS IV, WAIS reading test, Mini Mental State Examination ("MMSE"), Beck

inventories of anxiety and depression, and the [Millon Clinical Multiaxial

Inventory] MCM-III, a personality test."   (Docket 16-1 ¶¶ 23 & 24).   On July 12,

2013, Dr. Huxford summarized the results of Ms. Knight's neuropsychological

testing:

Working memory—low-average;

Processing speed—varied from average to borderline;

Set-shifting and cognitive flexibility—moderately impaired;[13]

Abstract reasoning and problem-solving—ranged from average to borderline;

Planning and organization—"disorganized";

Visual perception and organization—impaired;

Visual-spatial orientation—severely impaired;

Constructional functioning—average;

MMSE-23/30, within the range of "mild cognitive impairment";

Verbal memory—moderately impaired across trials, mildly impaired over a short delay and severely impaired over a long delay;

Nonverbal memory skills—severely impaired in both immediate and delayed trials; and

Receptive and expressive language skills—average although Ms. Knight demonstrated some difficulty with word-finding in the clinical interview.

(Docket 16 ¶¶ 77 & 79); see also AR at pp. 476-492.   Dr. Huxford's diagnosis included dementia—NOS; depressive disorder—recurrent, mild; anxiety disorder—NOS; and rule out PTSD.   (Docket 16 ¶ 80).   His report observed that in a less-controlled environment, "due to her memory impairments, [Ms. Knight] may be prone to lowered attention."   Id. ¶ 82.   Dr. Huxford's team

---

[13]For Social Security purposes, neuropsychological test scoring is rated in the following manner: "Scores two or more standard deviations below the mean (less than or equal to the 2nd percentile) . . . fall in the moderate deficit range.   A score two standard deviations below the mean is a 'marked' restriction.   Scores three or more standard deviations below the mean (less than or equal to the 0 .1 percentile) . . . fall in the severe deficit range."   (Docket 16 ¶¶ 172 and 172 n.4) (internal citation omitted).

recommended, among other things, continued medical and psychiatric consultations, psychotherapy, compensatory strategies, and psycho-educational resources, including continued use of a GPS and limiting driving to well-known areas.  Id. ¶ 85.

Between January 17, 2014, and January 21, 2015, Dr. Haas saw Ms. Knight ten times for medication management, prescribing Sertraline, for major depressive disorder; Trazodone, for difficulty sleeping; and Lorazepam for anxiety.  Id. ¶ 92.  Dr. Haas' diagnosis continued to include major depressive disorder, recurrent, mild; anxiety disorder, seizure disorder and dementia, unspecified.  (AR at pp. 1114, 1116, 1118, 1121, 1129, 1140, 1146, 1152-53 & 1156).

It was not necessary for Dr. Weisensee to formally incorporate the clinical reports and diagnostic findings of the team of medical professionals of the VA. Dr. Weisensee was entitled to rely upon the clinical and diagnostic findings and treatment provided by these VA health care specialists.  The progressive nature of Ms. Knight's dementia and associated mental health conditions is evident from the VA records.  Dr. Weisensee's opinion report of April 20, 2015, included the following:

> I am a board-certified neurologist, affiliated with the VA Black Hills Health Care System.  Sheila Knight has been my patient since 2008. . . .
>
> Ms. Knight has a confirmed diagnosis of dementia, with earliest documentation by Dr. Gardiner, neuropsychologist, in 1998.

Dementia is a progressive disease. Ms. Knight's dementia has progressed to the point where she is incapable of reliable attendance and performance in a competitive work setting.

I have reviewed the statements of two co-workers, Lori Benson and Gail Penning . . . . These reports are consistent with the known symptoms of dementia. During this same time period I treated Ms. Knight for seizures that initially were generalized tonic-clonic and subsequently were possibly partial complex. Such seizures are consistent with particular dementias.

The fluctuations in her symptoms, with good days of performance alternating with periods of poor performance, are likewise consistent with Ms. Knight's dementia.

Ms. Knight's difficulties with memory, word-finding, topographical disorientation, inability to remember how to perform once-familiar processes, loss of ability to spell and write ordinary sentences, marked inattention and distractability, unusual sleepiness during the day, intermittent tremor, and intermittent impaired gait and balance are consistent with Ms. Knight's dementia.

She has required the support services of occupational and speech therapy as well as home health services to maintain independent living within the community.

I am asked for my opinion regarding her work capacity. I think Ms. Knight could work in a sheltered situation during the morning hours when her functional level is typically at its best. On days when symptoms are more manifest, she may retain the ability to rally and possibly perform work activities for as much as two hours. On days when her symptoms of dementia are prominent, she would be house-bound.

(AR at p. 1214; see also Docket 16 ¶¶ 144-149). The ALJ's reason for giving no

weight to Dr. Weisensee's diagnosis and findings defies logic.

Before moving forward, the court must back up in time to 2012. The ALJ

gave "substantial weight" to the "examining source opinion" of Dr. Greg

Swenson. (AR at p. 37). The ALJ rejected the opinions of Dr. Dennis, described

earlier in this order, because his opinion was "clearly contradicted by the claimant's reported activities, and statements at the time indicating the results of Dr. Dennis were not valid, and by the examination findings and opinion of Dr. Swenson that are given greater weight." Id.

Dr. Swenson, a psychologist with the South Dakota Disability Determination Services, conducted a consultative examination on February 17, 2012. (Docket 16 ¶ 69; see also AR at p. 775). He administered a mental status examination ("MSE"), the WAIS-IV and WMS-IV tests of intelligence and memory. (Docket 16 ¶ 69). The results of those tests were:

WAIS-N subtest and index percentile scores ranged from the 5th percentile in arithmetic to the 63rd percentile in vocabulary;

Composite IQ scores were:

Verbal comprehension index—96;
Perceptual reasoning index—92;
Working memory index—74;
Processing speed index—92;
Full scale intellectual quotient—87; and
General ability index—94;

WMS-IV ranged from the 9th percentile to the 37th percentile; and

Working Memory Index—4th percentile.

Id. ¶¶ 73-74. Dr. Swenson reported Ms. Knight's general intelligence in 2012 was best represented by her general ability index of 94. Id. ¶ 75. In Dr. Swenson's opinion, "[t]his compensates for [a] low score[] . . . in an isolated area, measuring working memory attention." Id.

Contrary to the ALJ's perception of the issue, no one ever claimed that Ms. Knight's IQ was diminishing significantly. Compare, Dr. Gardiner's IQ test results with Dr. Swenson's IQ test results. Rather, it was her ability to function cognitively in the areas measured by the tests assessing cognitive functioning. Compare, the test results of Dr. Dennis, Dr. Swenson and Dr. Haas, supra. While there are some variations in the doctors' test results, they all identify levels of diminished cognitive capacity. The ALJ erred by rejecting the opinions of Dr. Dennis, a treating physician, and by giving the opinion of Dr. Swenson greater weight.[14]

The ALJ found that "Dr. Haas diagnosed only a major depressive disorder of mild severity, and an anxiety disorder—NOS." (AR at p. 40). This finding is contrary to Dr. Haas' continuous assessment that Ms. Knight suffered from dementia—NOS; depressive disorder—recurrent, mild; and anxiety disorder—NOS. (Docket 16 ¶ 80). The ALJ claimed that "Dr. Haas . . . accepted the diagnosis of dementia given by Dr. Huxford. However, he [Dr. Haas] did not opined [sic] to any specific limitations and his examination findings do not appear to reflect the severity of limitations asserted by the claimant . . . ." (AR at p. 43). While Dr. Haas did not specify any limitations on Ms. Knight's activities,

---

[14]The ALJ also erred by giving substantial weight to the opinions of the consulting psychologists, Dr. Buchkoski, Dr. Sole and Dr. Whittle, who only reviewed records through mid-2012. Opinions without consideration of all the updated records "fairly detracts from [the] decision" of the ALJ to adopt these consulting psychologists' opinions. Reed, 399 F.3d at 920.

he continuously prescribed three medications to address Ms. Knight's major depression, sleep issues and anxiety.

The ALJ gave "greatest weight to the opinion of Dr. Pelc" who examined Ms. Knight's records. Id. at p. 44. Dr. Pelc identified from those records three categories of psychological diagnoses: (1) cognitive disorder—NOS; (2) organic mental disorders; affective disorders characterized as adjustment disorder with depression, depressive disorder—NOS, and major depressive disorder, and (3) anxiety related disorders characterized as anxiety—NSO or PTSD. (Docket 16 ¶ 154). Dr. Pelc failed to acknowledge that Ms. Knight's records repeatedly and specifically diagnosed dementia.

Dr. Pelc chose to consider the medical records of Ms. Knight's ability to perform activities of daily living and gave little or no weight to the lay witnesses' statements which described their observations of Ms. Knight's ability to perform activities of daily living. (AR at pp. 71-73). As mentioned above, the clinical records include Ms. Knight's description of her daily activities through rose-colored glasses. Dr. Pelc refused to consider a lay witness' statement that Ms. Knight spends up to 10 days a month sleeping, because Dr. Pelc had no way "of knowing whether that's an accurate statement or not." Id. at pp. 72-73. Instead, he chose to rely on clinic notes. Id. at p. 73; see also AR at p. 70 ("I don't need a subjective statement by someone who is a nonmedical person, when I already have objective data about her concentration.").

Regarding home health care, the records disclose Dr. Pelc either failed to note Ms. Knight was a recipient of those services for over a year or failed to read the RN notes of those service contacts.   Id. at p. 73.   When questioned about the purpose of the service, Dr. Pelc responded "[f]rom a clinical standpoint, <u>is that nurse writing a report that's in this record somewhere that I haven't been allowed to see</u>?"   Id. (emphasis added).   Not allowed to see?   The home health service contact reports are referenced throughout the administrative record.   <u>See</u> Docket 16 ¶¶ 11, 93-95, 99-100, 129, 135 & 148; <u>see also</u> AR at pp. 494-97, 987-1001, & 1160-68.   The ALJ also acknowledged that Dr. Weisensee's April 20, 2015, report was not considered by Dr. Pelc.   (AR at p. 44).

It is apparent from the record that Dr. Pelc's opinion was not based on a thorough understanding of the record.[15]   Opinions without consideration of these records "fairly detracts from [the] decision" of the ALJ to adopt Dr. Pelc's opinion.   <u>Reed</u>, 399 F.3d at 920.

The ALJ erred, both factually and as a matter of law, when he chose to give substantial weight to the opinions of the consulting physicians.   The ALJ's decision to give greater weight to the opinions of Dr. Pelc and the state agency

---

[15]The same conclusion applies to the December 2011 consulting opinion of Dr. Alvin Wessel, who acknowledged that the packet of information sent to him did not have the findings of the neurological evaluation.   (Docket 16-1 ¶ 27).   "He strongly recommended obtaining the most recent 'every [sic] thorough neurological evaluation' from the VA as he did not have that for review."   (Docket 16 ¶ 150).   In addition, because of the progressive nature of dementia, Dr. Wessel's opinion was stale and obviously did not consider the neurological reports and the record developed after 2011.   <u>Reed</u>, 399 F.3d at 920.

physicians over the opinions of Dr. Weisensee is not supported by the record. 20 CFR § 404.1527(c)(2); Choate, 457 F.3d at 869; House, 500 F.3d at 744; Dolph, 308 F.3d at 878-79. This is especially true because Dr. Weisensee's extended treating relationship with Ms. Knight substantiates her opinions. Dr. Weisensee's opinions are entitled to controlling weight. House, 500 F.3d at 744. The Commissioner's findings on this issue are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate, 457 F.3d at 869.

Because of these rulings, the ALJ's decision at step three of the five-step analysis is flawed. While Ms. Knight argues she qualifies for benefits at step three, the Commissioner acknowledges the criteria for a step-three analysis changed between the time of the ALJ's decision and briefing on the appeal. (Docket 20 at p. 21). "[T]he Commissioner revised the mental listings [Appendix 1, Listing 12.02C] effective January 17, 2017. . . . The Commissioner applies the new criteria to all cases pending on or after the effective date." Id. at pp. 21-22. Remand is appropriate to permit the Commissioner to determine if Ms. Knight qualifies for benefits at step three.

Because of the court's decision at step three, it is not necessary to resolve Ms. Knight's other arguments, except to note that the court's decision that Dr. Weisensee's opinions are entitled to controlling weight impact the analysis at steps four and five. The court trusts on remand the Commissioner will direct an ALJ to conduct a proceeding consistent with the requirements of the five-step

sequential evaluation process for determining whether an individual is disabled.

20 CFR § 404.1520(a)(4).

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion to reverse the decision of the

Commissioner (Docket 17) is granted.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C.

§ 405(g), the case is remanded to the Commissioner for rehearing consistent

with this decision.

Dated February 28, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE